IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AAL HIGH YIELD BOND FUND and<br>DELAWARE DELCHESTER FUND, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| vs. | ) <br> ) | Civil Action Number |
| HAROLD J. RUTTENBERG, HELEN<br>ROCKEY, RANDALL L. HAINES, and<br>BANK OF AMERICA SECURITIES LLC f/k/a<br>NATIONSBANC MONTGOMERY<br>SECURITIES LLC, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | 00-C-1404-S |
| Defendants. | ) | |

## MEMORANDUM OPINION ON
## MOTIONS TO DISMISS

Defendants in this securities case have moved to dismiss the complaint on the ground that Plaintiffs have failed to state claims under Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), Section 10(b) and Rule 10b-5 and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Alabama Code Sections 6-5-101, 6-5-102. For the reasons which follow, the Court concludes that 1) the motions of Defendants Harold J. Ruttenberg and Bank of America Securities should be DENIED, 2) the motion of Defendant Randall L. Haines should be GRANTED, with leave to Plaintiffs to amend their complaint to plead fraud against this Defendants with the particularity required by F.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z-1, 77z-2, 78j-1, 78u-4, 78u-5 (1995) ("the Reform Act" or "PSLRA"); and 3) Defendant Helen Rockey's motion should be GRANTED.

**I.**

This lawsuit was brought as class action by named Plaintiffs AAL High Yield Bond Fund ("AAL") and Delaware Delchester Fund ("DDF"). AAL is a member of a family of mutual securities owned by Aid Association For Lutherans, a fraternal society for the benefit of Lutherans and their families. DDF is also a mutual fund.

Both of the Plaintiffs purchased a quantity of the 11% Senior Subordinated Notes due 2009 (the "Notes") of Just for Feet ("JFF" or "the Company") between April 12, 1999 and November 1, 1999. They seek to represent all similar purchasers of such notes between April 12, 1999 and November 1, 1999 (the "Class Period").

JFF was founded in 1977 as a small mall-based store in Birmingham, Alabama. Beginning in the mid-nineties, it embarked on an aggressive expansion strategy directed at the acquisition of other footwear retailers. As of 1999, it operated 137 retail "superstores" in 28 states and Puerto Rico, specializing in brand-name athletic and outdoor footwear and apparel and offering 2,500 to 4,500 styles of shoes. It owned 160 speciality stores. During the Class Period, JFF acquired at least three footwear retailers: Athletic Attic, Imperial Sports, and Sneaker Stadium. In Plaintiffs' view, the acquisition and integration of these stores were the genesis of JFF's inventory-related problems, which in turn gave rise to the alleged fraud.

Defendant Bank of America Securities LLC f/k/a NationsBanc Montgomery Securities ("NationsBanc") was a key creditor to JFF during this period of growth. Initially, the Company obtained a $40 million line of credit through Compass Bank ("Compass"). During fiscal year

2

1998, NationBanc's affiliate extended an additional $93 million to the Company, bringing the Company's credit line to $133 million. This line of credit was replaced in December 1998 with a $200 million revolving credit facility led by NationBanc's affiliate. On February 23, 1999, JFF obtained an $80 million term loan, which was designed as a bridge loan pending a note offering.

NationsBanc was the lead underwriter of the Offering. It was one of the four Initial Purchasers of the Notes. In the Offering Memorandum (the "Offering Memo"), discussed below, it was stated: "You should contact the Initial Purchasers with any questions about this offering or if you require additional information to verify the information in this offering memorandum." Offering Memo, p. ii.

NationsBanc is the named representative of the putative class of defendant underwriters who participated in the Offering.

Among the JFF's officers and directors during the Class Period were Defendants Harold J. Ruttenberg ("Ruttenberg"), Helen Rockey ("Rockey"), and Randall L. Haines ("Haines").

Ruttenberg served as Chairman of the Board and Chief Executive Officer ("CEO") of JFF until August 1, 1999, and he served as President of the Company until March 1999.

Rockey was appointed as President and Chief Operating Officer ("COO") of the Company in March 1999, less than one month prior to the Offering. Although she became a director of the Company in June 1999, she did not replace Ruttenberg as the Company's CEO until August 1, 1999.

In their complaint, Plaintiffs attribute certain statements specifically to Rockey in support of their 10(b) claims against her. First, Plaintiffs cite a March 16, 1999, article from the *Portland*

*Oregonian* quoting Rockey as saying that "[she] think[s] Just for Feet is going to be the Home Depot or Circuit City of the athletic footwear business." Compl. ¶¶ 5, 24.  Second, Plaintiffs point to Rockey's August 26, 1999 statement that "these management promotions further enhance our organization and will assist us in attaining our goal of becoming the dominant player in the athletic footwear market place." Compl. ¶ 53.  Additionally, Plaintiffs cite a June 16, 1999 article regarding JFF's Quarterly Report in which the $70 million excess inventory was disclosed and opined by Rockey as "one-time in nature." Compl. ¶ 48.

At all material times, Haines was a director of JFF and a member of its Audit Committee. Haines was also the President of the Birmingham Branch of Compass.

Plaintiffs' claims are based on two series of alleged misstatements/omissions: 1) statements and omissions in th April 12, 1999, Offering Memorandum ("Offering Memo") for the Notes, relating to JFF's then-current financial condition, inventory, inventory controls, and business prospects, and 2) subsequent statements by the Defendants concerning the current state of JFF's inventory, inventory controls, capability, and forecasts of future business prospects.  The alleged fraud was perpetrated in an effort to consummate the Offering and to maintain an inflated price for the Notes.

On March 19, 1999, JFF issued a press release stating that it planned a Note Offering of $200 million (the "Offering"), which represented more than one-half of the Company's entire market capitalization at that time.  The Notes, which were sold pursuant to the Offering Memo were offered to 200 or more mutual funds and other qualified institutional investors through the

4

use of "road shows" and other marketing processes. Ruttenberg and Rockey participated in these "road shows." NationsBanc was the lead manager of the underwriting.

The Company and the underwriters made several statements in the Offering Memo concerning inventory-related issues, including the following:

> Utilizing Sophisticated Management Information Systems. We believe that we have sophisticated information systems that assist us in optimizing our superstore operations. Control of our merchandising activities is currently maintained by a fully-integrated point-of-sale inventory and management system which permits management to monitor inventory and store operations on a daily or more frequent basis. Bar-coding of merchandise and use of scanners at receiving and point-of-sale allows the inventories of all stores to be automatically adjusted and sales automatically logged as customers check out. Purchasing, tracking, and receiving systems assist in the efficient and timely distribution of merchandise to each superstore. Systems are in place to permit review, on a daily or more frequent basis, of sales information by store, category, vendor or employee or in order to focus on store needs and employee productivity. In-store information systems are linked directly to the corporate office.

Offering Memo, p. 2.

These representations were consistent with prior representations made by Ruttenberg concerning the inventory systems in place. For example, in early February 1999, Ruttenberg told attendees of the Super Show in Atlanta that JFF's inventory and computer systems "rivaled those of Wal-Mart Stores and Home Depot." Based on these and other representations, the Offering was successful and was completed by April 16, 1999.

On May 25, 1999, JFF issued a press release announcing its results for the first quarter of the year. Defendant Ruttenberg noted that JFF was experiencing inventory control problems and was "implementing a program to significantly reduce inventory." The following day underwriter Alex Brown issued a report on the Company exposing that JFF had $50-70 million in excess inventory. JFF had, in fact, inventories existed at this level as of May 1, 1999 – just 14 days

5

after the Note Offering.

On the news that JFF had "discovered" excess inventory that had not been disclosed in the Offering Memo, the Notes dropped precipitously in price from 92 (on May 25, 1999) to 76 1/4 (on May 27, 1999). When JFF made an additional disclosure on July 28, 1999 that JFF's excess inventory was more than a one-time problem, the price of the Notes declined to 30 (on July 30, 1999).

In November 1999, after revelation of excessive inventory and inadequate inventory controls, trading in JFF's shares was halted at less than $2 per share and the Company filed for Chapter 11 bankruptcy protection.

On behalf of the putative class, Plaintiffs claim that all of the Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act and Section 12(a)(2) of the Securities Act, and that the individual Defendants violated Section 20(a) of the Exchange Act and Section 15 of the Securities Act ("Control Person Liability"). Individually, but not on behalf of the class, Plaintiffs claim that Defendants violated Alabama Code Sections 6-5-101 and 6-5-102.

## II.

For purposes of the motions to dismiss, all the allegations in the complaint must be construed in light most favorable to the plaintiffs. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). All facts alleged by the plaintiffs are taken as true. Id. A court cannot grant a motion to dismiss for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The issue on a motion to dismiss is *not* whether the plaintiffs will ultimately prevail; instead the determinative issue is whether the plaintiffs are entitled to offer evidence to support the claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1994).

In reviewing the sufficiency of this securities fraud complaint, the court must apply the heightened pleading requirements expounded in Fed. R. Civ. P.("Rule CP ") 9(b) and the Reform Act. Taken together, these provisions ensure that only those claims alleged with a requisite level of particularity are heard, "prevent[ing] plaintiffs from asserting baseless securities fraud claims" and using discovery as a means of uncovering unknown violations. In re Silicon Graphics Inc. Sec. Litig., 183 F. 3d 970, 977 (9th Cir. 1999). [1]

Rule CP 9(b) requires that "circumstances constituting fraud" be pled with particularity. See Gross v. Medaphis Corp., 977 F. Supp. 1463, 1470 (N.D. Ga. 1997). As affirmed by the Eleventh Circuit in Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F. 3d 1364, 1371 (11th Cir. 1997), this requirement is satisfied when the plaintiff identifies the person making the misrepresentation and alleges the time, place and content of the alleged false representation. In re ValuJet Inc., Sec. Litig., 984 F. Supp 1472, 1477 (N.D. Ga. 1997). While, "alternative means are also available to satisfy the rule," Durham v. Business Mgmt. Assocs., 847 F. 2d 1505, 1512 (11th Cir. 1988) (citing Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 724 F. 2d 786, 791 (3d Cir. 1984), (holding a list containing allegations of fraud describing nature and subject of statements to be sufficient, even where precise words used were not alleged)), an

---

[1]"In a joint statement, managers from the House and Senate declared that "Congress has been prompted by significant evidence of abuse in private securities lawsuits to enact reforms to protect investors and maintain confidence in our capital markets." In re Silicon Graphics, 183 F. 3d at 977-78 (quoting H.R. Conf. Rep. 104-369 at 31).

7

adequate complaint must at a minimum refer to a particular instance of misrepresentation.

The Reform Act has added the additional requirement that a plaintiff in a securities fraud action "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). The state of mind requirement of a 10(b) is scienter – the mental state embracing intent to deceive, manipulate, or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Though Circuits are somewhat divided on the question of what constitutes an adequate pleading of scienter under the Reform Act, the Eleventh Circuit has interpreted the Act to require a showing of "severe recklessness" by the defendant. Bryant, 187 F. 3d at 1282-83.[2] "[Severe recklessness] is limited to those highly unreasonable

---

[2]The Eleventh Circuit has soundly rejected the 'dual alternative' approach of the Second Circuit under which scienter can be pled *either* (1) by alleging facts showing that defendants had both motive and opportunity to commit fraud or (2) by alleging facts constituting strong circumstantial evidence of recklessness or conscious behavior. In Bryant, plaintiffs (and the SEC as *amicus curiae*) urged the Circuit Court to hold that a plaintiff can demonstrate a strong inference of scienter simply by pleasing facts showing that a defendant had motive and opportunity to commit fraud. Bryant, 187 F. 3d at 1285. The Eleventh Circuit rejected this expansive interpretation of the PSLRA scienter standard. Id. Relying on the plain language of the statute, the Eleventh Circuit expounded: "We quantify scienter as encompassing at least a showing of severe recklessness, and although motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness, we decline to conclude that they, standing alone, are its equivalent." Id. at 1286. The Court then expressed its agreement with the following reasoning of District Court Judge Thrash of the Northern District of Georgia that bears repeating here:

> The Eleventh Circuit has never adopted a scienter standard that follows the "motive and opportunity" analysis of the Second Circuit. A good argument can be made that the "motive and opportunity" standard lowers the bar for securities fraud cases below that mandated by the Supreme Court in Hochfelder. Greed is a ubiquitous motive, and corporate insiders and upper management always have opportunity to lie and manipulate. Furthermore, allowing private securities class actions to proceed to discovery upon bare allegations of motive and opportunity would upset the delicate balance of providing a remedy for genuine fraud while preventing abusive strike suits that the Reform Act sought to achieve. Motive and opportunity will ordinarily be relevant, and often highly relevant...[but] a showing

omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 1282 (quoting McDonald v. Alan Bush Brokerage Co., 863 F. 2d 809, 814 (11th Cir. 1989)).

Plaintiffs are required to plead in accordance with the Reform Act as to each separate defendant. While legally sufficient under Rule CP 9(b), "group pleadings" are insufficient under the Reform Act; each defendants is entitled to notice of his/her *own* alleged fraudulent statements and/or omissions. In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999).

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) to engage in any act, practice, or course of business which operates, or would

---

of motive and opportunity standing alone [is] insufficient to allege securities fraud under the "severe recklessness" standard established by the Eleventh Circuit. Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998).

9

>> operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

Id.

The Eleventh Circuit has held that to state a claim under Rule 10b-5, plaintiffs must establish: (1) a misstatement or omission, (2) of material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury. Bryant v. Avado Brands, Inc., 187 F. 3d 1271, 1283 (11th Cir. 1999). See also Ross v. Bank South, N.A., 885 F. 2d 723, 728 (11th Cir. 1989) *(en banc)*.

Section 12(a)(2) of the Securities Act imposes liability on "any person who,"

> offers or sells a security...by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, *by means of a prospectus* or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading...

15 U.S.C. §§ 77l(a)(2) (emphasis added). The Supreme Court has held that liability under § 12 extends not only to the actual seller, but also to any person "who successfully solicits the purchase, motivated by a desire to serve his own financial interests or those of the securities owner." Pinter v. Dahl, 486 U.S. 622 (1988).

A plaintiff in a § 12(a)(2) action can recover "without proof of either fraud or reliance," Johns Hopkins v. Hutton, 422 F. 2d 1124 (4th Cir. 1970), and are required to show only that there was a material misstatement or omission in the prospectus, with some causal effect on the plaintiff's decision to purchase. Jackson v. Oppenheim, 522 F. 2d 826 (2d Cir. 1976).

However, courts have consistently held that Rule CP 9(b) applies to all claims that

"sound in fraud." To the extent, therefore, that a plaintiff's § 12(a)(2) claims arise out of claims of fraud, the plaintiff must plead with particularity as to these claims as well. Taam Assocs. Inc. v. Housecall Med. Res., Inc., No. 1: 96 CV 2214A JEC, 1998 WL 1245361, at *11 (N.D. Ga. Mar. 30, 1998); Rhodes v. Omega Research, Inc., 38 F. Supp. 2d 1353, 1359 (S.D. Fla. 1999) (citing Shaw v. Digital Equipment Corp., 82 F. 3d 1194, 1223 (1st Cir. 1996)); Shapiro v. UJB Financial Corp., 964 F. 2d 272, 288 (3d Cir. 1992) (finding plaintiffs did not allege ordinary negligence but alleged "averments" of fraud by referencing the defendants' intentional and reckless misrepresentation of material facts); Kearny v. Jandernoa, 957 F. Supp. 116, 120 (W.D. Mich 1997); Schoenhaut v. American Sensors Inc., 986 F. Supp. 785, 795 (S.D.N.Y 1997) (determining that "the nub of allegations" under §12 (a)(2) sound in fraud and Rule 9(b) applies); In re Anchor Gaming Sec. Litig., No. CV-S-97-1751-DAE-RJI, 1999 WL 50079, at *4 (D.Nev. Jan. 6, 1999) ("[D]espite Plaintiffs' careful attempt to avoid use of the term 'fraud,' the Consolidated Amended Class Action Complaint nonetheless clearly sounds in fraud.")

In Gustafson v. Alloyd Co., Inc., 513 U.S. 561 (1995), the Supreme Court considered whether a purchaser of stock in a private, secondary sale could seek damages under § 12(a)(2) of the Securities Act based on certain allegedly false statements made in connection with the sale. Id. at 569-70. The Court held that the plaintiff could not state a claim under § 12(a)(2) because such claims are limited to purchasers who bought stock in a public offering conducted pursuant to a prospectus issued under the 1933 Act. Id. at 584.

The decision turned on the Supreme Court's finding that a private stock purchase agreement is not an offering document encompassed by the statutory term "prospectus," the type of offering document to which Section 12(a)(2) applies. The Court concluded that the word

11

"prospectus" is, "a term of art referring to a document that describes a public offering of securities..." Id. at 584. Hence, where the offering or solicitation materials relate only to a private placement, and the registration requirements do not apply, those materials are not subject to §12(a)(2). See, e.g., Whirlpool Financial Corp. v. GN Holdings, Inc., 67 F. 3d 605, 609 n.2 (7th Cir. 1995) (holding that a §12(a)(2) claim had been properly dismissed where claims related to a purely private placement); Walish v. The Leverage Group, Inc., No. CIV. A. 97-CV-5908, 1998 WL 314644, at *5 (E.D. Pa. June 15, 1998) ("Gustafson clearly states that Section 12(a)(2) does not apply to private sales of securities."); Lennon v. Christoph, No. 94 C 6152, 1997 WL 57150, at *23 (N.D. Ill. Feb. 7, 1997). See also In re JWP Inc. Sec. Litig., 928 F. Supp 1239, 1259 (S.D.N.Y. 1996); Glamorgan Coal Corp. v. Ratner's Group PLC, No. 93 CIV. 7581 (RO), 1995 WL 406167, at *3 (S.D.N.Y. July 10, 1995).

Whether the transaction in question was not registered because it is claimed it was exempt under Section (4)(2) or Regulation S or Rule 144A is not dispositive. "Liability imposed by § 12(a)(2) has nothing to do with the fact of registration," but rather with "whether a prospectus is a document soliciting the public to purchase securities from the issuer." Gustafson, 513 U.S. at 579. Lower court decisions subsequent to Gustafson have recognized this principle. See, e.g. Vannest v. Sage, Rutty & Co., Inc., 960 F. Supp. 651 (W.D.N.Y. 1997) ("not all public offerings are registered"); Sloane Overseas Fund v. Sapiens Intern Corp. N.V., 941 F. Supp. 1369 (S.D.N.Y. 1996).

Section 20(a) of the Exchange Act imposes joint and several liability on any person "who controls a person liable under any provision of [the Exchange Act]." Section 15 of the Securities

Act imposes joint and several liability on any person who "controls and person liable under section 11 or 12 [of the Act]." The text of these provisions plainly requires the plaintiff to prove not only that one person controlled another person, but also that the "controlled person" is liable under the Act. If no controlled person is liable, there can be no controlling person liability. Wool v. Tandem Computers, Inc., 818 F. 2d 1433, 1440-41 n.8 (9th Cir. 1987).

Sections 20(a) and 15 do not create a separate cause of action, but rather depend on the viability of the § 10(b) claims. "Controlling person" liability can exist only if primary liability has been established as to another defendant. Therefore, once all predicate §10(b) claims are dismissed, there are no allegations upon which §20(a) and §15 liability can be based.

Rule 9(b) of the Alabama Rules of Civil Procedure states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Alabama Rule 9(b) requires the pleader to "use more generalized or conclusionary statements setting out the fraud. The pleader must state the time, the place, the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained." Robinson v. Allstate Ins. Co., 399 So. 2d 288, 289-90 (Ala. 1981). See also Thomas v. Baptist Medical Center-DeKalb, 614 So. 2d 997, 999 (Ala. 1993); Crommelin v. Capitol Broadcasting Co., 195 So. 2d 524, 526 (Ala. 1967).

Alabama courts have concluded that Alabama Rule 9(b) should be interpreted like its federal counterpart, Fed. R. Civ. P. 9(b). See Grayson v. Grayson, 628 So. 2d 918, 919-920 (Ala. 1993) ("[T]he similarity of the Federal and the Alabama Rules of Civil Procedure creates a presumption that federal caselaw construing the federal rules are authority for interpretation of

the Alabama rules.").

### III

As Chairman of the Board, President, and CEO of JFF during most of the Class Period, Defendant Ruttenberg was primarily responsible for the day-to-day control of the Company and for th preparation of the various statements in the Offering Memo. If anyone should have known of the inventory problems presented by the JFF's acquisitions, it would have been this Defendant. He certainly had access to all the available information. If he were oblivious to the state of the inventory in the hectic pace of acquisitions and nonetheless made the statements concerning inventory and inventory controls in the Offering Memo and elsewhere, or permitted them to be made, then Plaintiffs may indeed be able to show the severe recklessness required in a Rule 10b-5 action.

The complaint states a valid 10b-5 cause of action against Ruttenberg. It likewise states sufficient facts to entitle Plaintiffs to offer evidence on their "controlling person" and state law claims against him.

As a member of the Audit Committee of JFF's Board of Directors, Defendant Haines and another director were responsible for monitoring the Company's financial and control procedures. As such, he could not take a wilfully blind eye to questionable control procedures which exist under his watch. While motive and opportunity alone are not sufficient to establish scienter, he certainly possesses an amply supple of both. When these factors are joined with Haines' strategic position with the Board of Directors, they may be enough to infer scienter.

Even so, the complaint has not attributed a single misstatement or omission to Haines. It does not meet the heightened pleading requirements of the Reform Act. Plaintiffs will be granted leave to correct this deficiency, if they can.

It this posture, it would be premature to dismiss the "control person" claim against Haines.

Plaintiffs' claims against NationsBanc, for purposes fo the motions to dismiss, are based both on NationsBanc's status as an underwriter and its status as an Initial Purchaser. In the latter capacity, NationsBanc held itself out to prospective investors as the ultimate source for verification of the statements made in the Offering Memo. If a would-be investor needed information about JFF's inventory and inventory controls, for example, it should turn to NationsBanc, which in turn would "verify the information in this offering memorandum."

Under the circumstances of NationsBanc status as underwriter, Initial Purchaser, and guarantor of the veracity of the statements in the Offering Memo, the complaint sufficiently articulates 10b-5 and state law claims against NationsBanc.

Defendants argue that, as a private placement, the Offering is beyond the reach of § 12 (a)(2) and that these claims are due to be dismissed even if Plaintiffs have complied with the pleading requirements of Rule CP 9(b). The legitimacy of Plaintiffs' § 12(a)(2) claims therefore turns on whether the Offering Memo is a "prospectus" for a "public offering" under <u>Gustafson</u>.

The line between public offerings and private placements is neither well-defined nor easily decipherable. Even after <u>Gustafson</u>, this distinction remains hotly debated by the plaintiffs'

and defendants' bars, and has not yet been entirely resolved by the courts. Ultimately, the question is one of fact and demands an inquiry into factors such as the marketing strategies employed, the scope of the Offering, and the "sophistication" of the offerees.[3] Plaintiffs and Defendants have introduced contravening evidence relevant to this inquiry.

While this Court agrees that the scope of § 12(a)(2) is narrower than that of §10(b), the Court is not required to address this issue in order to determine that the complaint sufficiently states a cause of action under this statute. The "private placement" argument as a bar to Plaintiffs' entitlement to present evidence on this claim is rejected.

Plaintiffs have totally failed to plead a fraud cause of action against Rockey. First, there is, and can be, no allegation that any of the statements in the Offering Memo are attributable to her. Plaintiffs concede that Rockey did not even join the Company until a few weeks before the Offering was completed. Compl. ¶ 13(a). The most recent financial statements included in the Offering Memo were dated six months before Rockey commenced her employment with JFF.

The media statements attributed to Rocky are mere statements of optimistic beliefs. Such forward-looking statements of optimism are not actionable under 10(b). See Shields v. City Trust Bancorp, Inc., 25 F. 3d 1124, 1129 (2d Cir. 1994) (statements of opinion of optimistic

---

[3]The decision in Sloane, 941 F. Supp. 1369 (S.D.N.Y. 1996) is instructive in regards to the factors a court may deem relevant in characterizing an offering as public or private. In Sloane, as here, certain notes were ultimately sold to investors by means of an Offering Circular pursuant to a registration exemption provided under Rule 144A or, as to sales outside the United States, Regulation S. The court held that, given the "wide distribution" of the Offering Circular, the offering was public and, therefore, Section 12(a)(2) applied. Id. at 1376-77. See also ESI Montgomery County, Inc. v. Montenay Int's Corp., 899 F. Supp. 1061, 1065 (S.D.N.Y. 1995); Flakev. Hoskins, 55 F. Supp. 2d 1196, 1228 (D.Kan.199).

16

beliefs, expectations, corporate goals are not material and cannot serve as the basis for a 10(b) cause of action); See also Harris v. Ivax, 192 F. 3d 799, (11th Cir. 1999).

Plaintiffs have failed to allege any facts giving rise to an inference–let alone the requisite strong inference–that Rockey acted in a 'severely reckless manner'–as required by the Reform Act.

The circumstances of Rockey's affiliation with the Company make it reasonably certain that, even if granted leave to amend, Plaintiffs can never meet the fraud pleading requirements with respect to Rockey.

By separate order, the Motions to Dismiss will be granted in part and denied in part.

Done this the 30th day of September, 2001.

_____
Chief United States District Judge
U. W. Clemon